# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | **Case No. 1:21-cr-218 (3) (APM)** |
| v. | : | |
| | : | |
| PAUL SPIGELMYER, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Paul Spigelmyer to 14 days' incarceration as a condition of a 36-month term of probation, 60 hours of community service, and $500 in restitution.

## I.      Introduction

Defendant Paul Spigelmyer, a 68-year-old construction worker, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.[1]

---

[1]      Although the Statement of Offense in this matter, filed on June 17, 2022, (ECF No. 73 at ¶6) reflects a sum of more than $1.4 million dollars for repairs, as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Paul Spigelmyer pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G).  As explained herein, a sentence of a brief period of incarceration as a condition of probation is appropriate in this case because (1) the defendant remained in the Capitol, specifically the Rotunda, for nearly ten minutes when it was clear that police were attempting to clear that area, (2) the defendant made inflammatory public statements on his Facebook page after the riot, such as suggesting the Capitol should be "burn[ed] to the ground," (3) the defendant lied to investigators in his post-arrest interview, and (4) the defendant has yet to show any contrition for his participation in the riot.

The Court must also consider that Spigelmyer's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings.  *See United States v. Thomas Fee*, 1:21-cr-00133 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic process[ ] of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates).  The defendant's actions and those of his fellow rioters enabled the breach of the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).  Here, the facts of and circumstances of Spigelmyer's crime support a sentence of 14 days' incarceration as a condition of a 36-month term of probation, 60 hours of community service, and $500 in restitution.

## II.      Factual and Procedural Background

*The January 6, 2021, Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  (*See* ECF No. 76 (Statement of Offense), at 1-7.)  As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day.  With that backdrop we turn to Spigelmyer's conduct and behavior on January 6.

*Defendant Paul Spigelmyer's Role in the January 6, 2021, Attack on the Capitol*

Paul Spigelmyer and his co-defendants and friends, Matthew and Christy Clark, drove together from their homes in Lewistown, Pennsylvania to attend the "Stop the Steal Rally" in Washington, D.C.  On January 6, 2021, they attended the rally and were admitted to the cordoned-off area at the Ellipse, near the White House.  After the former president finished speaking, the Clarks and Spigelmyer returned to their car to collect some items, including the flags pictured below, then headed towards the Capitol.



*Figure 1 – Screenshot of image posted to Christy Clark's Facebook page showing Matthew and Christy Clark and a friend walking towards the Capitol on January 6.  (Spigelmyer not pictured)*

The Clarks and Spigelmyer approached Capitol grounds from the west, crossed the grounds on the North Side, and approached the Capitol building on its East Front.  By the time of their arrival, the riot was well underway.  Hordes of rioters who, by the end of the two o'clock hour, had successively breached the East Rotunda Doors, attacking police and smashing glass in the Doors in the process, crowded the East Stairs.

While the defendants likely did not witness the initial breaches of these Doors, as they arrived on Capitol grounds closer to 3:00 p.m., they were aware that the Capitol had been breached.  Matthew Clark posted the following to Facebook page at 2:22 p.m. on January 6:



*Figure 2 – Screenshot of January 6 post on Matthew Clark's Facebook page*

Christy Clark sent a private Facebook message at 2:24 p.m. stating, "Capital has been breached,"

and, at 2:26 p.m. "We r headed there [the Capitol] now preped [sic] for war."

On Capitol grounds, the Clarks took photos, which they posted publicly to Facebook.



*Figure 3 – Image posted to Matthew Clark's Facebook page showing crowd of rioters having overtaken the East Front of the Capitol*



*Figure 4 – Screenshot of post to Matthew Clark's Facebook page showing rioters packed into the area directly outside of the East Rotunda Doors and a comment from Matthew Clark that says, "My wife took this pic."*



*Figure 5 – Screenshot of image posted to Christy Clark's Facebook page showing rioters packed into the area directly outside of the East Rotunda Doors*

The Clarks and Spigelmeyer entered the Capitol through the East Rotunda Doors at approximately 3:05 p.m.  As the defendants crossed the threshold of the Capitol building, rioters inside rapidly shuffled backwards as if trying to get out of the way.  CCTV shows the defendants

entering the building with momentum, suggesting that they either ran in or were pushed from the outside.  All three carried large flags on poles as they entered.



*Figure 6 – Screenshot of CCTV showing the Clarks and Spigelmyer breaching the Capitol through the East Rotunda Doors at approximately 3:05 p.m.*

The defendants proceeded directly into the Rotunda which was already packed with rioters. Almost immediately after the defendants' arrival in the Rotunda, a large contingent of Metropolitan Police Department officers arrived and began to clear rioters from the area.



*Figure 7 – Screenshot of CCTV showing the Clarks and Spigelmyer in the Rotunda filled with rioters and police*

Rather than turn around and leave, the defendants stood and watched for multiple minutes while police closed in.   As they watched officers clearing the Rotunda, Christy Clark and Spigelmyer pulled hoods over their heads and covered their faces, as if trying to obscure their identities from the police or protect their mouths and noses from chemical irritant.



*Figure 8 – Screenshot of CCTV showing defendants in Rotunda, Matthew Clark pointing at police while they clear the Rotunda*

Before long, the successful efforts of police to clear the area penned the crowd, including the defendants, on one side of the Rotunda.  As the police closed in, the defendants saw rioters pushing back and getting aggressive with police (*see* Figure 9, below).  At that point, the defendants had no choice but to move with the crowd toward the nearest exit, the East Rotunda Doors.



*Figure 9 – Screenshot of CCTV showing defendants in a crush of rioters as police clear the Rotunda*

After being pushed out of the Rotunda, the defendants reentered the interior lobby of the East Rotunda Doors.  On their way out, Christy Clark turned towards police and gestured at them, then laughed, as if jeering at the officers.  The defendants exited the Capitol building at approximately 3:13 p.m.

 

*Figures 10 and 11 – Screenshots of CCTV showing Christy Clark gesturing at police standing by while the Rotunda clears*



*Figure 12 – Screenshot of CCTV showing defendants exiting the Capitol*

*Defendants' Social Media Activity*

Defendants Matthew and Christy Clark posted publicly visible photos from their time on Capitol grounds to their Facebook accounts, as shown above in Figures 1-5.  Christy Clark publicly posted one photo from inside the Capitol Rotunda:



*Figure 13 – Screenshot of publicly visible post to Christy Clark's Facebook page showing the Capitol Rotunda dome from the inside of the building*

To this photo (Figure 13), Christy Clark added a comment: "I stopped and took a second to pray before I took this pic. It was overwhelming to say the least."  Christy Clark privately messaged multiple people in the hours after the riot, saying "We were inside."  Christy Clark said in one private Facebook message, "Bitch I went right in there [the Capitol]."  In another private message to a Facebook friend, to whom Christy Clark sent photos and video, Christy Clark said, "I have pics I'm not posting right now till we see if I'm already in trouble. Lol."  Information obtained by the FBI suggests that Christy Clark deleted the publicly visible posts on her Facebook page shortly after posting them.

Spigelmyer took photos from inside the Capitol which he sent to Facebook "friends" in private messages:



*Figures 14 (left), 15 (middle), 16 (right) – Photos sent by Spigelmyer via private Facebook message, which appear to have been captured inside the Capitol Rotunda.*

With Figure 14, Spigelmyer included the message: "This is a picture of the moment we stormed the doors."  One of the "friends" to whom Spigelmyer sent a private message asked, "Where [sic] you in the group that got into the Capitol" and Spigelmyer replied, "Yes we were the second round of people break in."  The friend then asked, "You didn't get arrested did you," and Spigelmyer replied, "No but it was close."

Spigelmyer also made statements after and related to the Riot in posts to his Facebook page, including, "What happened at the capital yesterday should and must continue till this election fraud is stopped"; (2) "My view of the capital is, burn it to the ground"; (3) "I am all for more protest and storming the capital building and I would love to see them burn it to the ground"; (4) "The capital building needs to be burnt down it doesn't belong to the people that work there"; and (5) "When it comes to Nancy Pelosi trying to impeach Donald Trump I think the best thing that could happen is for the MS 13 gang members to go to her house and take care of business."  (*See* Figures 17-19, below.)



*Figure 17 – Public post on Spigelmyer's Facebook page*



*Figure 18 – Public post on Spigelmyer's Facebook page*



*Figure 19 – Public post on Spigelmyer's Facebook page*

*Paul Spigelmyer's FBI Interview*

Paul Spigelmyer voluntarily agreed to be interviewed by the FBI after he was arrested.  In the interview, Spigelmyer insisted that the riot was a "peaceful" protest and suggested that public officials such as Representative Maxine Waters or Senator Chuck Schumer should be investigated for inciting a riot rather than the former president.  Spigelmyer claimed that he and the Clarks were "shoved" into the Capitol from the outside.  Spigelmyer, like his co-defendants, reported seeing a

rioter in possession of a knife and that Christy Clark spoke to a police officer, alerting the officer to the rioter with the knife.  When asked directly whether he took any pictures inside the Capitol building, Spigelmyer denied doing so.  When asked again, Spigelmyer said, "I took pictures on the outside."  After being warned that lying to a federal law enforcement officer could result in additional charges, Spigelmyer was asked again whether he took pictures inside the Capitol, and he said, "I might've."  Spigelmyer then admitted that he might've taken four or five pictures inside the Capitol.  Spigelmyer exhibited no remorse or regret for his conduct.

*The Charges and Plea Agreement*

On February 8, 2021, the United States charged Paul Spigelmyer by criminal complaint with violations of 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G).  On March 12, 2021, the United States charged Spigelmyer by four-count Information with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G).  On June 29, 2022, pursuant to a plea agreement, Spigelmyer pleaded guilty to Count 4 of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G).  By plea agreement, Spigelmyer agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Spigelmyer now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000.  The defendant must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 14 days' incarceration as a condition of a 36-month term of probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Spigelmyer's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors,

including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated sincere remorse or contrition.  While the above factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

Each Capitol Riot case presents a unique mix of aggravating and mitigating factors.  It follows that the absence of certain aggravating factors in this case that are present in other Capitol Riot cases is not necessarily mitigating.  Further, the absence of violent or destructive acts on the part of a misdemeanor defendant is not a mitigating factor—had Spigelmyer personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct.

The defendants entered the Capitol building shoulder to shoulder with hundreds of other rioters.  As is visible in the images that they recorded, they progressed past thousands of people to reach the upper terrace on the East side of the Capitol, and eventually make it through the East Rotunda Doors, which had been violently breached multiple times.  The defendants excitedly, deliberately crossed the threshold of the Capitol building amidst blaring alarms.

While inside, the defendants stood by and watched while police cleared the Rotunda.  They had a full view of the officers' effort and appeared to be talking about it (*see, e.g.*, Figure 8, showing Matthew Clark pointing at officers clearing the Rotunda while Christy Clark and

Spigelmyer standing next to him).  The defendants knew they were not supposed to be there, and yet they passively observed while police were obviously trying to get them and other rioters in the Rotunda to leave.  The defendants' disregard of the officers and clear signs that they should leave is aggravating.

As is the defendants' use of social media.  Paul Spigelmyer's Facebook posts after the riot included egregious and dangerous rhetoric regarding the Capitol—"burn it to the ground"—and the public servants who work there, including his statement that the Capitol should be burned because it "doesn't belong to the people that work there" and his suggestion that Speaker of the House Nancy Pelosi should be killed by gang members.  In addition to exhibiting disturbing tolerance for violence, Spigelmyer's vitriolic statements further demonstrate that he had absolutely no remorse regarding his participation in the riot, and no realization in the days following the riot that it was extreme, unlawful, and extremely destructive.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence imposing a brief period of incarceration as a condition of probation in this case.

### B.  Paul Spigelmyer's History and Characteristics

Paul Spigelmyer is employed as a mason tender and has been employed in construction throughout his career.  He works on an as-needed basis.  As set forth in the PSR, Paul Spigelmyer's criminal history consists of a conviction for Possession of a Controlled Substance and arrests for possession of controlled substances and Driving Under the Influence.  (PSR ¶¶ 31-37.)

Spigelmyer has been compliant with the conditions of his pretrial and pre-sentencing release.  However, Spigelmyer shared with a friend the identity of a tipster that was produced to him in discovery.  That friend then harassed the tipster online.  The government does not have

sufficient information to conclude that Spigelmyer's disclosure was malicious or that he intended his friend to harass the tipster.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2]  This factor weighs in favor of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most

---

[2]    Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

compelling reason to impose a sentence of incarceration.   "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-

CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that

their attack on the Capitol would disrupt, if not prevent, one of the most important democratic

processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge

Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to
> attack the Capitol to prevent our elected officials from both parties from performing
> their constitutional and statutory duty, democracy is in trouble. The damage that
> [[Defendant Last Name]] and others caused that day goes way beyond the several-
> hour delay in the certification. It is a damage that will persist in this country for
> decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven

months ago for the United States and our diplomats to convince other nations to pursue democracy.

It means that it will be harder for all of us to convince our children and our grandchildren that

democracy stands as the immutable foundation of this nation."  *Id.* at 70.

The gravity of these offenses demands deterrence.  This was not a protest.  *See United

States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can

be made defending what happened in the Capitol on January 6th as the exercise of First

Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential

rioters—especially those who intend to improperly influence the democratic process—that their

actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Paul Spigelmyer's post-arrest interview, his statements on social media after the riot, and

the absence of any expression of remorse to the PSR writer clearly demonstrate the need for

specific deterrence for this defendant.  Spigelmyer has expressed absolutely no remorse for his participation in the riot, contrary to characterizations in his sentencing memorandum.  (ECF No. 88 at 9.)  All of the evidence available to the government indicates that, in the days after the riot, Spigelmyer stood by the more violent aspects of the riot.  If anything, his statements indicate that the riot did not go far enough.

Contrition matters.  It is essential to a system that seeks to prevent crime through rehabilitation.  It is also component of measuring just punishment.  But contrition expressed for the first time at sentencing, when that contrition is vastly outweighed by statements suggesting the opposite, is too little, too late.  *See United States v. Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.").

The government acknowledges that Spigelmyer has accepted responsibility by entering a guilty plea.  But his failure to thus far acknowledge the seriousness and wrongfulness of his and his fellow rioters' conduct demands specific deterrence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3]  This

Court must sentence Spigelmyer based on his own conduct and relevant characteristics, but should

give substantial weight to the context of his unlawful conduct: his participation in the January 6

riot.  Although those like Spigelmyer convicted of misdemeanors are generally less culpable than

defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were

not minor crimes.  A probationary sentence should not be the default.[4]  *See United States v. Anna

Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression

that probation is the automatic outcome here because it's not going to be.") (statement of Judge

Lamberth at sentencing); *accord United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr.

9/17/2021 at 13 (statement of Judge Friedman).

Spigelmyer has pleaded guilty to Count 4 of the Information, charging him with parading,

picketing, or demonstrating in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  This

offense is a Class B misdemeanor.  18 U.S.C. § 3559.  Certain Class B and C misdemeanors and

infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply,

U.S.S.G. 1B1.9.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to

---

[3]     Attached to this sentencing memorandum is a table providing additional information about
the sentences imposed on other Capitol breach defendants.  That table also shows that the requested
sentence here would not result in unwarranted sentencing disparities.

[4]     Early in this investigation, the Government made a very limited number of plea offers in
misdemeanor cases that included an agreement to recommend probation, including in *United
States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-
cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is
abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United
States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing
disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track"
program and those who do not given the "benefits gained by the government when defendants
plead guilty early in criminal proceedings") (citation omitted).

avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as

22

conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case. The government has often recommended, and judges have imposed, periods of incarceration in cases where a defendant's conduct has included one or more of the various aggravating factors present here. For instance, judges have imposed incarceration in cases involving defendants who publicly minimized or boasted about their conduct on January 6. *See, e.g., United States v. Kelly O'Brien*, 21-cr-633 (RCL) (imposing 90 days incarceration where the defendant posted videos to Facebook during the siege of the U.S. Capitol calling her fellow rioters as "brave patriots"; was aware of the potential for violence, noting in one of her Facebook videos that she was going to stay back, yet ultimately continued closer towards the Capitol building and entered the Capitol; made statements, including "no regrets…[,]" on Facebook in the days immediately following her breach of the Capitol that demonstrated a total lack of remorse); *United States v. Frank Scavo*, 21-cr-254 (RCL) (imposing 60 days' incarceration where the defendant made public statements following the riot, including a television interview, that either downplayed or made light of his conduct); *United States v. James Little* (RCL) 21-cr-315 (imposing 60 days' incarceration sent a text from inside the Capitol which said, "We just took the Capitol," and minutes later sent another text stating, "We are stopping treason! Stealing elections is treason! We're not going to take it anymore!"); *United States v. Boyd Camper*, (CKK) 21-cr-325 (imposing 60 days' incarceration where the defendant understood Capitol attack was violent but went anyways, and he gave a television interview on January 6 in which he showed no remorse and called what he was doing an insurrection).

Further, judges have imposed harsher sentences in cases where the defendant blatantly disregarded police orders. *See, e.g., United States v. Joshua Wagner*, 1:21-CR-00310 (imposing 30 days' jail time where defendant, among other things, ignored police orders in the Crypt); *United States v. Bradley Rukstales*, 1:21-CR-00041 (imposing 30 days' jail time where, among other things, it took three officers to drag the defendant to be arrested) ; *United States v. Terry Brown*, 1:21-CR-00041 (imposing 30 days' home detention and 36 months' probation where, among other things, defendant was arrested after refusing to leave pursuant to law enforcement orders).

Judges have imposed harsher sentences in cases where the defendant witnessed and/or recorded breaches or violence against police officer. *See, e.g., United States v. Anthony Vuksanaj*, 1:21-CR-00620 (imposing 42 days' intermittent confinement and 36 months' probation where, among other things, defendant was present during two physical clashes with police, and yet did not exit the building but instead continued to trespass through the Capitol); *United States v. David Mish*, 1:21-CR-00112 (imposing 30 days' jail time where, among other things, defendant, who was in the Capitol for about 30 minutes, took photos, heard the shot that killed Ashli Babbitt, and witnessed violence against law enforcement).

Judges have emphasized the importance defendants' remorse or lack thereof and considered the latter aggravating. *See, e.g., United States v. Jeremiah Caplinger*, 1:21-CR-00342 (imposing 35 days' jail time and 24 months' probation where, among other things, defendant engaged in a multitude of behaviors that demonstrated a lack of remorse: posting statements on social media on and after Jan. 6th that demonstrated a lack of remorse, participating in a photoshoot and giving interviews that demonstrated a lack of remorse to two separate publications, omitting information and repeatedly downplaying  his actions on January 6th during an FBI interview, and shirking the terms of his pretrial release by repeatedly used marijuana);  *United States v. Philip*

*Weisbecker*, 1:21-CR-00682 (imposing 30 days' intermittent confinement and 24 months' probation where, among other things, defendant wandered through restricted hallways and into the Rotunda where he took photographs of himself, posted statements on social media which demonstrated a total lack of remorse, verbally abused law enforcement officials who stopped and questioned him about January 6 and engaged in post-guilty plea verbally abusive conduct towards transportation officials he believed harassed him, demonstrated defendant's contempt for public officials).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.  This Court's Authority to Impose a Sentence of Up to 14 Days of Imprisonment and Probation.

As eight judges of this District have now concluded, this Court has the authority under 18 § 3561(a)(3) to impose a "split sentence," *i.e.*, a sentence requiring both a term of imprisonment and a term of probation, on a defendant who has been convicted of a "petty offense." *See, e.g.*, *United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022)

(concluding that " a split sentence is permissible under law and warranted by the circumstances of this case), *appeal pending*, D.C. Circuit No. 22-3018; *see, e.g.*, *United States v. Little*, 21cr315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21cr591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. 21cr342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21cr290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21cr630 (CJN), ECF 37 (D.D.C. April 22, 2022) (same); *United States v. Entrekin*, 21cr686 (FYP), ECF 34 (D.D.C. May 6, 2022) (same); *United States v. Revlett*, 21cr281 (JEB), ECF 46 (D.D.C. July 7, 2022) (same); *United States v. Getsinger*, 21cr607 (EGS), ECF 60 (D.D.C. July 12, 2022) (same); *United States v. Ticas*, 21cr601 (JDB), ECF 40 (D.D.C. July 15, 2022) (same); *United States v. Caplinger*, 21cr342 (PLF), ECF 74 (D.D.C. August 1, 2022) (same).[5]  This Court should follow suit and sentence Spigelmyer to 4 days' incarceration as a condition of probation.

But this Court need not decide that question in this case because there is no dispute that such a defendant can be required to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised

---

[5]     In *United States v. Lindsey*, 21-cr-162 (BAH), ECF 102, the defendant pleaded guilty to three counts: 18 U.S.C. § 1752(a)(1); 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). Chief Judge Howell sentenced Lindsey to five months incarceration on each of the § 5104 counts, to be served concurrently, and 36 months' probation on the § 1752(a)(1) count.

release." 18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration imprisonment as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*

Although the statute does not define an "interval of time," case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, *e.g.*, for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation).  A 14-day term of imprisonment is therefore permissible under Section 3563(b)(10).  *See United States v. Stenz*, 21-cr-456 (BAH) ECF 38 (D.D.C. Feb. 17, 2022) (imposing imprisonment under Section 3563(b)(10); *United States v. Schornak*, 21-cr-278 (BAH) ECF 71 (D.D.C. Feb. 18. 2022) (same); *United States v. Herendeen*, 21-cr-278 (BAH) ECF 87 (D.D.C. Apr. 1, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH) ECF 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Reed*, 21-cr-204 (BAH) ECF 178 (D.D.C. Apr. 14, 2022) (same); *United States v. Watrous*, 21-cr-627 (BAH) ECF 40 (D.D.C. Apr. 21, 2022) (same); *United States v. Vuksanaj*, 21-cr-620 (BAH) ECF D.D.C. Apr. 29,

2022) (43 (same); *United States v. Heinl*, 21-cr-370 (EGS) ECF 43 (D.D.C. June 8, 2022) ECF 43 (same); *United States v. Cameron*, 22-cr-00017 (TFH) ECF 36 (D.D.C. Aug. 17, 2022) (same).

No court appears to have decided whether a term of continuous imprisonment greater than two weeks but less than 30 days is consistent with Section 3563(b)(10), and the government does not advocate such a sentence here. Practical concerns with multiple short terms of intermittent confinement (i.e., nights and weekends in jail), which would require repeated entries and departures from a detention facility during the COVID-19 pandemic, thereby increasing the risk of spreading contagion in the facility, may militate against imposing this type of "intermittent" confinement.  For that reason, any 14-day term of imprisonment imposed as a condition of probation under Section 3563(b)(10) should be ordered to be served without interruption.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant Paul Spigelmyer to 14 days' incarceration as a condition of a 36-month term of probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:     ___/s/_____
Kathryn E. Fifield
Trial Attorney
U.S. Department of Justice, Crim. Div.
Detailed to the D.C. U.S. Attorney's Office
601 D St. NW
Washington, D.C. 20530
Kathryn.fifield@usdoj.gov
(202) 320-0048